UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| WAYNE SAMUELS, | |
|---|---|
| *Plaintiff*, | Civil No. 3:11-CV-1046 (JBA) |
| *v.* | |
| CAROLYN W. COLVIN,[1] | |
| ACTING COMMISSIONER OF SOCIAL SECURITY | September 6, 2013 |
| *Defendant.* | |

RULING ON RECOMMENDED RULING

Plaintiff Wayne Samuels commenced this action under Section 205(g) of the Social Security Act, 42 U.S.C §§ 405(g) and 1383(c), as amended.  He seeks review of a final decision of the Commissioner of Social Security denying Plaintiff Supplemental Security Income ("SSI") benefits.  Magistrate Judge Margolis recommended [Doc. # 30] denying Plaintiff's Motion [Doc. # 23] for Reversal of the Commissioner's Decision or Remand, and granting Defendant's Motion [Doc. # 27] to Affirm the Decision of the Commissioner.  For the reasons that follow, the Recommended Ruling is approved and adopted in part with modification, and the case will be remanded to the ALJ.

I.      Background

The Magistrate Judge's Recommended Ruling details the factual and procedural background and is incorporated by reference here.  Briefly, in March 2010, Plaintiff applied for Disability Insurance Benefits ("DIB") and SSI due to bipolar disorder,

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure,  should be substituted for Michael J. Astrue as the defendant in this suit.  Colvin became the Acting Commissioner of Social Security on February 14, 2013. No further action need be taken to continue this suit.  *See* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of the Commissioner of Social Security or any vacancy in such office.").

depression, anxiety, back pain, migraines, and high blood pressure. (*See* Certified Transcript of Administrative Proceedings, dated September 28, 2011 ("Tr.") 179, 193.) Plaintiff's application was denied initially and upon reconsideration after Plaintiff submitted additional evidence. (*See* Tr. 45–52, 57–72.) A hearing was then held before an Administrative Law Judge ("ALJ") on January 7, 2011. Plaintiff was represented by counsel at that hearing and continues to be represented throughout this action.

      Plaintiff is a 52-year-old man currently residing at the Fish Shelter in Torrrington, Connecticut. (Tr. 121, 26.) According to Plaintiff, he suffers from several mental impairments, including manic episodes, panic attacks, obsessive compulsive disorder (OCD), and depression. (*See* Tr. 31–34.) As a result, Plaintiff's mind is clouded, and he has trouble with memory, concentration, following instructions, and getting along with other people. (Tr. 163–64.) He has to take several naps throughout the day due to the side effects of his medications. (Tr. 32.) He also has trouble sleeping, and often makes up with nightmares about his mother or about dying. (Tr. 33.) When Plaintiff is suffering from depression, he feels irritable and confrontational and does not want to talk to anyone, including his doctor. (Tr. 34–35.)

      Dr. Steven L. Singer and Judith Peck, a licensed social worker, completed two assessments of Plaintiff for Defendant in which they noted that Plaintiff was treated biweekly for bipolar disorder, OCD, and cocaine dependence. (Tr. 372–79.) In July 2010, Dr. Signer and Peck noted Plaintiff's problems with attention and concentration. In response to a series of questions on a form, they checked boxes indicating that Plaintiff had "A Slight Problem" carrying out multi-step instructions, focusing long enough to finish simple tasks, and performing work activity on a sustained basis, but "No Problem"

in other categories of daily living activities, social interaction, and task performance. (Tr. 377–78.) One month later, although Dr. Singer and Peck noted a "Slight Improvement" overall in Plaintiff's treatment, they checked boxes indicating that his ability to carry out multi-step instructions and focus long enough to finish tasks had worsened by one degree on a scale of one to five. (Tr. 438–39.)

Dr. Michael Caruso of Charlotte Hungerford Hospital ("CCH"), where Plaintiff underwent outpatient treatment from October 2009 to December 2010, completed a Mental Impairment Questionnaire on behalf of Plaintiff. (Tr. 769–74.) Dr. Caruso noted that Plaintiff continued to exhibit many symptoms related to depression, including difficulty thinking and concentrating. (Tr. 769–70.) In response to a series of form check-box questions, Dr. Caruso indicated that Plaintiff was "[s]eriously limited but not precluded" in his ability to understand, remember, and carryout detailed instructions and his ability to deal with the stress of semiskilled and skilled work. (Tr. 772.) In other areas of evaluation, Dr. Caruso indicated that Plaintiff's mental capabilities were either "[l]imited but satisfactory" or not limited at all. (Tr. 771–72.) Dr. Caruso checked a box indicating that Plaintiff would be absent from work "[a]bout one day per month" for medical appointments (Tr. 774), but earlier on the form, he checked a box indicating that Plaintiff had no limit in his ability to "[m]antain regular attendance and be punctual within customary, usually strict tolerances," (Tr. 771).

A vocational expert testified before the ALJ that eight absences in a given year is generally tolerated by employers, and that a person limited to simple routine work in a stable environment without constant supervision or high-pressured production demands could perform three of Plaintiff's past jobs. (Tr. 38–39.) If, however, Plaintiff were absent

3

from work frequently or often in conflict with co-workers, he would not be able to perform any of his past work. (Tr. 39.)

II.     **Discussion**

   A.     **Standard of Review of a Magistrate Judge's Recommended Ruling**

The Court reviews *de novo* those portions of the Recommended Ruling to which an objection is made, and may adopt, reject, or modify, in whole or in part, the Recommended Ruling. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).

   B.     **Standard of Review of a Social Security Disability Determination**

This Court will "set aside the ALJ's decision only where it is based upon legal error or is not supported by substantial evidence." *Balsamo v. Chater,* 142 F.3d 75, 79 (2d Cir. 1998). "Substantial evidence 'is more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Yancey v. Apfel,* 145 F.3d 106, 111 (2d Cir. 1998) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). The substantial evidence standard also applies to inferences and conclusions that are drawn from findings of fact. *See Gonzalez v. Apfel,* 23 F. Supp. 2d 179, 189 (D. Conn. 1998).

The Social Security Act provides that every individual who suffers from a "disability" is entitled to disability insurance benefits. *See* 42 U.S.C. § 423(a)(1). "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

In reviewing disability claims, the agency must follow a five-step process. First, the agency will determine whether a claimant is engaged in substantial gainful activity and, second, whether the claimant has an impairment which is of the required duration and which significantly limits his ability to work. If the claimant is engaged in substantial gainful activity or does not have a sufficiently severe impairment, the claim will be denied. *See* 20 C.F.R. § 404.1520(a)-(c). Third, the medical evidence of the claimant's impairment is compared with a list of impairments presumed severe enough to preclude any gainful work, and if the claimant's impairment matches or "equals" one of the listed impairments, he or she qualifies for benefits without further inquiry. *See* 20 C.F.R. § 404.1520(d). However, if the claimant does not qualify under the listings, the agency must take the fourth step of determining whether the claimant can perform his or her own past work, *see* 20 C.F.R. § 404.1520(e)-(f), and if not, take the fifth step of assessing the claimant's present job qualifications, and whether jobs exist in the national economy that claimant could perform. *See* 20 C.F.R. § 404.1520(g); *see also generally Heckler v. Campbell*, 461 U.S. 458, 460–61 (1983). In making this determination, the agency may rely on medical-vocational guidelines which establish, through rulemaking, the types and numbers of jobs that exist in the national economy. *See Campbell*, 461 U.S. at 460. The burden of establishing a disability is on the claimant, and once the claimant demonstrates that he or she is incapable of performing his or her past work, the burden shifts to the agency to show that the claimant is capable of pursuing alternative work. *See Balsamo*, 142 F.3d at 80.

### C. The ALJ's Decision

Following the five-step evaluation process, the ALJ concluded that Plaintiff suffers from the following severe impairments: bipolar disorder, OCD, and panic disorder, but that under step three, Plaintiff's level of impairment did not match or equal one of the listed impairments in 20 C.F.R. § 404, Appendix 1. (Tr. 13.)  At step four, the ALJ found that Plaintiff had the residual functional capacity to perform "simple, routine tasks in a stable work environment without constant intense high pressured supervision or production demands." (Tr. 17.)  As a result, the ALJ determined that Plaintiff could perform his past relevant work as a night selector/delivery assistant, injection molding machine operator, and label machine operator.  Accordingly, the ALJ concluded that Plaintiff was not under a disability.

### D. Plaintiff's Objections

Plaintiff objects to the Recommended Ruling on five grounds, which will be addressed in turn.

#### 1. Prior Applications

First, Plaintiff argues that the Recommended Ruling incorrectly approved of the ALJ's failure to obtain his prior applications for DIB and SSI benefits from 2003 and 2009. (Pl.'s Obj. [Doc. # 35] at 18.)  Plaintiff argues that these files are relevant because, although he amended his alleged onset date of disability to March 18, 2010, the ALJ repeatedly referred to the originally alleged onset date of June 1, 1993 in his analysis. (*Id.*) As noted in the Recommended Ruling, however, Defendant's Decision Review Board (DRB) corrected this mistake by noting the ALJ's "conflicting findings" and concluded that Plaintiff was not disabled any time after the amended onset date. (Tr. 4–5.)  The

6

DRB's corrected findings, and not the ALJ's initial findings regarding the onset date, constitute the Commissioner's final decision subject to review here.  *See* 20 C.F.R. § 404.979 ("The Appeals Council may affirm, modify or reverse the administrative law judge hearing decision . . . ."); *Ketcham v. Astrue*, No. 10-CV-140 (CR), 2011 WL 3100673, at *7 (D. Vt. July 25, 2011) ("[T]he court hereby . . . AFFIRMS the Commissioner's decision, as corrected by the DRB.").  Given that the Commissioner's final determination of Plaintiff's claims was based on a March 2010 onset date, Defendant did not err in declining to request Plaintiff's prior application materials.

       2.      *Plaintiff's GAF Score*

Second, Plaintiff argues that the Recommended Ruling improperly approved the ALJ's reliance on one instance in which Plaintiff's global assessment of function ("GAF") score was above a range that would indicate a disabling mental limitation without acknowledging that Plaintiff's GAF score in twenty-seven out of thirty tests in the record indicated that he was disabled.  (Pl.'s Obj. at 6.)  The Recommended Ruling noted that all but three of these GAF scores predated the amended onset date, and thus were not relevant.  (*See* Rec. Ruling at 24.)  It further noted Defendant's regulations that a GAF score "does not have a direct correlation to the severity requirements in [the SSA's] disorders listings."  (*Id.* (quoting *Daniel v. Astrue*, No. 10-CV5397 (NGG), 2012 WL 3537019, at *10 (E.D.N.Y. Aug. 14, 2012)).)  Plaintiff counters that the one GAF score cited by the ALJ also predated the amended onset date and, accordingly, the ALJ's conclusion "is not supported by substantial evidence if one GAF Score before March 18, 2010 supports the ALJ's conclusion, but twenty-seven GAF Scores before March 18, 2010 do not." (Pl.'s Obj. at 6.)  Plaintiff also objects that Magistrate Judge Margolis discounted

the value of GAF scores in general under Defendant's regulations, but nevertheless relied upon this single GAF score to conclude that the ALJ's finding was based on substantial evidence. (*Id.*)

Although Defendant's regulations note that GAF scores are not directly related to the severity of an illness, the scores can be relevant and considered in an ALJ's analysis. *See Daniel*, 2012 WL 3537019, at *10 ("Dr. Corley's GAF score of 55, while relevant, does not contradict his ultimate finding that Daniel was disabled and unable to work . . . ."). Further, the single GAF score cited by the ALJ was just one of multiple considerations underlying his conclusion that while Plaintiff's claims regarding his pain symptoms were "legitimate," his statements regarding their "intensity, persistence and limiting effects" were "not credible to the extent they [were] inconsistent with the residual functional capacity assessment." (Tr. 16.)  The ALJ's conclusion here was based on Plaintiff's testimony regarding his ability to conduct "a wide range of daily activities," evidence that he stopped working due to a "lack of work" rather than disability, and the treating records of multiple doctors who did not find that Plaintiff had "marked limitations." (*Id.*)  Given that the ALJ's conclusion was based on a number of factors aside from the GAF score, it was supported by "substantial evidence."

3. *Treatment of Medical Evidence*

Third, Plaintiff argues that the Recommended Ruling incorrectly approved the weight that the ALJ gave to the opinions of two treating physicians and the ALJ's failure to follow the treating physician rule.  In support of this claim, Plaintiff asserts that Magistrate Judge Margolis engaged in "an unacceptable *post hoc* rationalization" of the ALJ's treatment of medical evidence by citing approximately ten pages of medical records

8

that were not cited by the ALJ. (Pl.'s Obj. at 9 (citing Rec. Ruling at 21–22).) Further, while purporting to adopt Dr. Caruso's opinion, Plaintiff argues, the ALJ improperly rejected only those parts of Dr. Caruso's report that undermined the conclusion that Plaintiff was not disabled. (*Id.* at 10.) In particular, the ALJ rejected Dr. Caruso's opinion—which he expressed by checking off a box on a form ("Question Thirteen")—that Plaintiff's impairments and treatments would require him to be absent from work "[a]bout one day per a month." (Tr. 17, 774.) Because the only choice for fewer absences presented on the form was "[n]ever," the ALJ concluded:

> the form was thus set up to force any expected absences to be characterized as frequent. This limitation is rejected as arbitrary, unsupported and contrived. Otherwise, I am persuaded by Dr. Caruso's opinion and accord it controlling weight in establishing the claimant's residual functional capacity. Dr. Caruso's opinion is supported by the objective medical evidence and a clinical examination of the claimant.

(Tr. 17.)

The ALJ's rejection of Dr. Caruso's opinion here is significant, because the vocational expert testified that the maximum number of absences per month tolerated by employers is "usually no more than one every one-and-a-half months" or "about eight times a year." (Tr. 38.) Plaintiff argues that despite crediting Dr. Caruso in all other areas, the ALJ disregarded his absenteeism opinion without crediting contradictory evidence, and, accordingly, he "speculate[d], with no supporting evidence whatsoever." (Pl.'s Obj. at 14.) Defendant counters that the ALJ's conclusion here was reasonable and supported by Dr. Caruso's response to checkbox Question Eight, § I, Part E ("Question Eight") in which he indicated that Plaintiff had an "Unlimited or Very Good" mental

ability to "[m]aintain regular attendance and be punctual within customary, usually strict tolerances." (Def.'s Mem. Supp. [Doc. 27-1][2] at 20 (citing Tr. 771).)[3]

Under the "Treating Physician Rule," the "opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence. In analyzing a treating physician's report, the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." *Rosa v. Callahan*, 168 F.3d 72, 78–79 (2d Cir. 1999) (internal citations and quotations omitted). Given that the ALJ may only give controlling weight to medical evidence that is well supported by medical findings, he or she is free "to choose between properly submitted medical opinions." *Balsamo*, 142 F.3d at 81 (internal quotations omitted). He may not, however, "set his own expertise against that of a physician who [submitted an opinion to or] testified before him." *Id.* (alteration in original) (internal quotation marks omitted).

The Court concludes that the ALJ may have improperly rejected Dr. Caruso's medical opinion regarding the work absenteeism that would result from Plaintiff's continuing treatment needs. While the ALJ was free to choose between valid medical

---

[2] Defendant did not submit a brief in response to Plaintiff's objections to the Recommended Ruling and instead relied on its briefing submitted to the Magistrate Court. (*See* Def.'s Response [Doc. # 36] at 1.)

[3] In yet another section of the form, Question Nine, Dr. Caruso responded to a "yes/no" question, by writing "n/a." (Tr. 772.) Plaintiff argues that this response indicates that Dr. Caruso could have clarified his response to Question Thirteen if he actually believed that "[n]ever" and "[a]bout one day per month" were not adequate choices. (*See* Pl.'s Obj. at 14–15.) The Court notes, however, that unlike Questions Thirteen and Eight, Question Nine had two lines of blank text below it and requested a complete explanation of the doctor's form response. Additionally, Dr. Caruso appears to have initially checked "no" before crossing it off and writing "n/a."

opinions in reaching his conclusion regarding Plaintiff's future medical needs, he appears to have simply rejected Dr. Caruso's opinion in response to Question Thirteen without relying upon any other medical information that contradicted it. True, Dr. Caruso's medical opinion expressed on a check-box form was not necessarily entitled to great weight. *See Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best."). But in order to reach a contrary conclusion, the ALJ needed to rely upon some other medical advice instead of substituting his opinion for that of the treating doctor or engaging in sheer speculation. *See Balsamo*, 142 F.3d at 81 ("We need not address whether the treating physicians' opinions bound the ALJ under [the Treating Physician Rule] because in this case the Commissioner failed to offer and the ALJ did not cite *any* medical opinion to dispute the treating physicians' conclusions that Balsamo could not perform sedentary work."); *cf. Hatcher v. Astrue*, 802 F. Supp. 2d 472, 476 (W.D.N.Y. 2011) ("I find that the ALJ's determination—that the check-sheet completed [by a physician was not] entitled to controlling or significant weight . . . was not erroneous. The ALJ correctly observed that those reports conflicted with the bulk of the medical evidence in the record, including the treatment notes of plaintiff's other treating physicians and acceptable medical sources, in that they described a level of disability far in excess of that reflected in the rest of the record.").

It is entirely possible that, as the ALJ concluded, Dr. Caruso was hamstrung by the limited options on the form, but the evidence is, at best, inconclusive.[4] Without contrary

---

[4] Dr. Caruso's form response to Question Eight indicating that Plaintiff would be able to maintain regular attendance "within customary, usually strict tolerances" (Tr.

medical evidence, the ALJ could not reject this otherwise controlling opinion on what turned out to be a dispositive issue. To the extent that the ALJ believed there was ambiguity in the record, he was required to contact Dr. Caruso to clarify his position. *See Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] *sua sponte*."); *see also Rosa*, 168 F.3d at 79 ("[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel . . . ." (internal quotations omitted)). Because the ALJ's conclusion here was not based on substantial evidence, Plaintiff's objection to the Recommended Ruling is sustained and this case will be remanded to the ALJ to clarify the record regarding Plaintiff's anticipated future absenteeism and its effect on his ability to work.[5]  *See Reda v. Astrue*, No. 08-CV-6589

---

771), is of limited probative value on this point given that it is far vaguer than Question Thirteen, which called for a specific number range of absences. Moreover, Question Eight is part of a series of questions evaluating how the "patient's mental/emotional capacities are affected by the impairment(s)." (*Id.*) The logical conclusion, therefore, is that Dr. Caruso's response referred to Plaintiff's mental ability to understand and adhere to a work schedule rather than the effect of Plaintiff's medical treatment needs on that schedule. In any event, what constitutes "customary, usually strict tolerances" for absences is not a medical opinion, but rather the province of the vocational expert. Given these considerations, Dr. Caruso's response here provides little meaningful information regarding to what degree Plaintiff's anticipated future medical treatment needs will require him to miss work.

[5] The ALJ may wish to distinguish between the total number of days in which Plaintiff will need medical attention and the total number of days in which Plaintiff will need to miss work as a result of such appointments. In particular, he could examine the extent to which Plaintiff could schedule appointments during non-work hours. *See Barnett v. Apfel*, 231 F.3d 687, 691 (10th Cir. 2000) ("[P]laintiff's current extrapolation of

(CJS), 2010 WL 2104521, at *5 (W.D.N.Y. May 24, 2010) (remanding for rehearing where "the ALJ rejected [the treating physician's] finding that [the plaintiff] would miss work one or more times per month," because the ALJ did not provide "'good reasons' for the lack of weight attributed to a treating physician's opinion").

### 4. *Purported Factual Errors*

Next, Plaintiff objects that the Recommended Ruling did not address most of the nine "factual errors" and "misstatements, distortions, and mischaracterizations of the evidence" that Plaintiff identified in the ALJ's analysis, which collectively denied Plaintiff "a full and fair hearing." (Pl.'s Mem. [Doc. # 23-1] at 21, 31.) First, Plaintiff objects to the Recommended Ruling's acceptance of the ALJ's determination that Plaintiff did not have severe impairments from his occipital neuralgia brought on by head injuries and which resulted in severe head pain, throbbing, and headaches. (*See* Pl.'s Obj. at 3–4.)

After review of the record, the Court concludes that this objection should be overruled. The ALJ did "not doubt that the claimant's pain symptoms that appear throughout the record are legitimate," but concluded that the "objective evidence falls short of demonstrating the existence of pain and limitations that are so severe that the claimant cannot perform any work on a regular or continuing basis." (Tr. 16.) As the Recommended Ruling recognized, the "severity regulation requires the claimant to show that he has an 'impairment or combination of impairments which significantly limits' 'the

---

how many days she must have missed from work based on her medical record is faulty . . . in that it assumes she was required to miss entire days of work for each appointment."). Additionally, given the vocational expert's testimony that an employer would tolerate absences "about eight times a year" (Tr. 38), even if Dr. Caruso confirms his response to Question Thirteen, the ALJ should obtain a more precise estimate of Plaintiff's anticipated absenteeism to determine if it comports with his expected work requirements.

abilities and aptitudes necessary to do most jobs.'" *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (quoting 20 CFR §§ 404.1520(c), 404.1521(b) (1986)). In determining that Plaintiff had not met this burden, the ALJ consulted "several treating source opinions, none of which, however, assess the claimant with marked limitations." (Tr. 16.) In concluding that Plaintiff's "symptoms were well controlled with medication" (*id.*), the ALJ cited medical records in which Plaintiff reported that his headaches occurred only one to two times per month and were "usually responsive to [M]otrin," (Tr. 390.) Given the medical evidence that Plaintiff's headaches were infrequent and generally controlled by medication, the ALJ's conclusion that Plaintiff's headaches did not preclude him from working was based on substantial evidence.

Plaintiff contends that the following findings by the ALJ were also erroneous: (1) Plaintiff is able to engage in "several typical activities of daily living" with only "mild restriction" (Pl.'s Mem. Supp. at 25 (citing Tr. 13–14)); (2) Plaintiff's "social functioning is only mildly impaired" (*id.* at 26 (quoting Tr. 14)); (3) "With regard to concentration, persistence, or pace, the claimant has moderate difficulties" (*id.* at 27 (quoting Tr. 14)); (4) despite this mild impairment of concentration, Plaintiff "is able to concentrate and attend to tasks sufficient enough for skilled work" *id.* (quoting Tr. 14)); (5) treatment notes from Charlotte Hungerford Hospital showed that Plaintiff's "[m]ental status examinations were essentially normal" (*id.* at 29 (quoting Tr. 16)); (6) Plaintiff "reported improved sleep and fair energy" (*id.* at 30 (quoting Tr. 16)); and (7) Plaintiff's "symptoms were well controlled with medication," (*id.* (quoting Tr. 16).)

The Recommended Ruling concluded that it "need not address" these additional arguments regarding the ALJ's purported factual errors and misstatements—which

Defendant characterizes as a contention of insufficient evidence—because the ALJ adopted Dr. Caruso's medical findings as controlling and such findings provided substantial evidence to support the ALJ's conclusions. (*See* Rec. Ruling at 23 n.20; Def.'s Mem. Supp. at 9.)

The Court agrees that the ALJ's conclusions were based on substantial evidence and supported by medical evidence. The ALJ relied upon and adopted Dr. Caruso's opinion, and afforded "some weight" to the opinions of Dr. Singer and Peck. (Tr. 17.) All of the seven purported factual errors listed above were based on the opinions of these three treatment providers. The first four purported factual errors are in fact directly supported by the evaluations of Dr. Caruso, Dr. Singer, and Peck. (*See* Tr. 773, 377–78, 439–40.) Likewise, the latter three purported errors regarding Plaintiff's treatment at Charlotte Hungerford Hospital are all supported by the hospital's medical records. (*See* Tr. 338–39, 342, 346, 329, 387, 415.) Accordingly, the purported factual errors identified by Plaintiff are in fact supported by the record, and the ALJ's corresponding conclusions were therefore based on substantial evidence.

        5.     *Residual Functional Capacity*

Finally, Plaintiff contends that the Recommended Ruling incorrectly approved of the ALJ deciding this case at step four of the evaluation process for two reasons. First, Plaintiff argues that he cannot perform his past work as a night selector/delivery assistant, injection molding machine operator, and a label machine operator. (*See* Pl.'s Obj. at 20–21.) As Defendant concedes and the Recommended Ruling recognized, Defendant cannot actually perform his prior job as an injection molding machine operator, because it is a semi-skilled job precluded by the ALJ's residual functional capacity analysis. (*See*

Rec. Ruling at 25.) The Court concludes, however, that Plaintiff has not met his burden of demonstrating that he cannot perform his two remaining prior jobs.[6] The ALJ determined that Plaintiff could perform "simple, routine tasks, in a stable work environment, that did not involve constant and intense supervision or high pressured production demands." (Tr. 15.)

Plaintiff argues that the ALJ did not precisely define the terms used in this description and, as a result, it is not clear that Plaintiff could in fact perform the two prior jobs. As an initial matter, the Court finds that the ALJ's description of Plaintiff's residual functional capacity was clear, especially in light of his discussion of the supporting medical evidence and Dr. Caruso's explanation of Plaintiff's limitations in these records. (*See* Tr. 16–17, 771.) Next, as the Recommended Ruling recognized, there is no support for Plaintiff's contentions that his limitations precluded him from performing his two prior relevant jobs.[7] (*See* Rec. Ruling at 26.) For example, the *Dictionary of Occupational Titles* explains that "Taking Instructions-Helping" is not a significant part of the duties required of a night selector or delivery assistant (defined as a laborer). *See* DICOT

---

[6] In light of this conclusion, the ALJ's error regarding the first job does not require remand. *See Cichocki v. Astrue*, No. 12-CV-3343, slip op. at 8 n.1 (2d Cir. Sept. 5, 2013) (summary order) ("The ALJ's determination that Cichocki could perform this work constitutes harmless error, however, because the ALJ correctly determined that she was capable of performing her past work as a bakery clerk.").

[7] Plaintiff asserts that there is no evidence to contradict his testimony that he worked as a label machine operator for only "a few months" (Tr. 28), and that under Defendant's regulations, a job of less than six months may not properly be considered prior relevant work, (*see* Pl.'s Obj. at 21.) In fact, the record appears to clearly show that Plaintiff worked as a labeling machine operator from April 2001 to February 2002. (Tr. 147–48.) In any event, the job is classified as unskilled (Tr. 38), and thus could be learned in about thirty days rather than six months. *See* 20 C.F.R. §§ 404.1568(a), 416.968(a).

922.687-058, 1991 WL 688132.  Accordingly, such jobs would not involve "constant and intense supervision" precluded by Plaintiff's residual functional capacity.

Second, Plaintiff argues that the ALJ failed to present the vocational expert with all of Plaintiff's mental and physical limitations.  (*See* Pl.'s Obj. at 21–22.)  As the Recommended Ruling recognized, all of the elements of the ALJ's residual functional capacity determination were included in the hypothetical posed to the vocational expert.  (*See* Tr. 15, 38).  Plaintiff also argues that the hypothetical posed to the vocational expert was improper because it did not include the ALJ's findings that "[w]ith regrard to concentration, persistence, or pace, the claimant has moderate difficulties."  (Pl.'s Obj. at 21 (quoting Tr. 14).)  As the ALJ recognized, however, his discussion of Plaintiff's moderate difficulties in these areas related to the severity of Plaintiff's mental impairments at steps two and three of the sequential analysis, not his residual functional capacity.  (*See* Tr. 15.)  The ALJ was not required to include these limitations in his description of Plaintiff's residual functional capacity.  *See Cichocki v. Astrue*, No. 12-CV-3343, 2013 WL 4749644, at *5 n.3, __ F.3d __ (2d Cir. Sept. 5, 2013) ("Having determined at Step Two that Cichocki's bipolar disorder did not constitute [a severe] impairment, the ALJ did not err in failing to assess the impact of this disorder at Step Four.").  "Moreover, a finding of difficulty in concentration, persistence or pace can arguably be found to be subsumed within the ALJ's finding" regarding Plaintiff's residual functional capacity, which was presented to the vocational expert.  *Burrows v. Barnhart*, 3:03-CV-342 (CFD) (TPS), 2007 WL 708627, at *14 (D. Conn. Feb. 20, 2007).  Accordingly, Plaintiff's objection to the ALJ's residual functional capacity analysis is overruled.

III.     Conclusion

For the reasons discussed above, the Recommended Ruling [Doc. # 30] is ADOPTED and APPROVED with modification. Plaintiff's Motion [Doc. # 23] is GRANTED, as to the request for remand, and DENIED, as to the request for reversal. Defendant's Motion [Doc. # 27] is GRANTED in part and DENIED in part. This case is REMANDED as described above for further development of the record regarding Plaintiff's future medical treatment needs and their effect on his ability to work.


                                IT IS SO ORDERED.

                                   /s/
                                Janet Bond Arterton, U.S.D.J.


        Dated at New Haven, Connecticut this 6th day of September, 2013.